Thomas Walker on the 28th of November, 1777, and 3d of April, 1778, paid into the Eoan-Office certain sums of money, and obtained the proper certificates ; for which the government gave him a receipt on the 25th of May, 1779, in discharge of a British debt. After the act of 1796, upon the subject of such payments, his executor applied for certificates for the said sums and interest; but the treasurer insisted upon reducing them by the scale of depreciation of May, 1779. This was at first objected to ; but as the treasurer persisted, the executor received certificates for the amount according to the scale ; expressly declaring, however, that it should not prejudice his claim to the original sums and interest. He afterwards applied to the auditor for a warrant for the difference between the sum received and that to which he conceived himself entitled, but was refused it; in consequence of which he appealed to the High Court of Chancery ; where it was decreed that the auditor should issue warrants for the value of the sums according to the scale at the times when they were paid into the Eoan-Office: from which decree an appeal was taken to this Court.
Attorney-General, for the Commonwealth. The question to be decided by this Court is, whether the scale of depreciation is to be applied at the time the money was deposited in the Eoan Office, or when it was paid in discharge of the British debt, by taking the governor’s receipt for that purpose.
It will, indeed, be contended by the counsel on the other side, that the debt ought not to be scaled at all. This is an important question ; but it is one on which all men seem to have agreed. During our revolutionary war the property of British subjects, in this state, was sequestered, and by an act passed in 1777, citizens of this Commonwealth owing money *76 to a subject of Great Britain were allowed to pay it into the Loan-Office, taking- a certificate in the name of the '^creditor, with an endorsement of the commissioner of loans, expressing the name of the payer, which certificate was to be delivered to the governor and council, whose receipt should discharge the debtor for so much. In 1796, after the decision of the Supreme Court of the United States that those payments did not discharge the debtor from the demands of his creditor, the Legislature passed an act authorising the persons who had thus paid money into the Loan-Office to receive a certificate from the treasurer for the amount according to the scale of depreciation at the time the payments were severally made, together with interest. It will not perhaps, be contended that because the money was due from the state, the debt was not to be scaled, for that point was settled in the case of the Commonwealth and Beaumarchais, (a) But it will be insisted, that because it was paid under the faith of a law, the Commonwealth is bound to release the debtor.
I will not question the motives of the Federal Court, but have no hesitation in saying their decision was wrong. Virginia, being a sovereign state, had a right to pass the law in question; and a mere treaty, after the passage of the law, could not annul it. Although treaties are declared by the Federal constitution to be the supreme law of the land, yet they cannot have a retrospective operation, so as to annul the acts of sovereign states : nor has the judiciary of the United States any such power.
It may be said that the application of the scale was a hardship on those who owed British debts; but they cannot complain ; because the principle established by the Legislature is perfectly equitable as between individuals, and they are placed on the same footing as all other persons. Ours was not an ordinary situation. Young and inexperienced in the art of war, helpless in the means of carrying it on, and contending with one of the most powerful nations in the world, we were compelled to resort to every expedient authorised by the law of nations to annoy our enemy and promote the success of our cause. Large quantities of paper money, which has emphatically been called “the shield of America,” were emitted. All classes of citizens suffered more or less by its rapid depreciation ; and every individual had to make some sacrifices ; but this, with other evils incident to a state of war, was only purchasing our liberties at a cheap rate. From the necessity of the case, this paper money was finally called in, at a great reduction from its nominal value; and a scale of depreciation ^established for the adjustment of debts contracted during its existence. This was effected by positive legislative acts, and, in many instances, operated as injuriously on individuals, as the reimbursement according to the scale, to those who owed British debts, would now do. If it is admitted that the legislature has power to pass laws, the debtors, in this case, can only claim in the manner in which they are authorised to be paid; that is, by the scale of depreciation.
The only question is, when ought the scale to be applied ? The money was paid into the Loan-Office in 1777 and 1778, but not transferred to the sequestration fund till 1779 ; and the act of 1796 expressly says that the money shall be repaid according to the scale of the time it was originally paid on account of the British creditor.
But it may be said that this is not a common case; and because the money was loaned in 1777 and 1778, the scale ought to be applied at that time, and not when it was paid on account of the British debt. When the Loan-Office certificate was deposited in the sequestration fund, it ceased to exist ; and the receipt of the governor and council was the only evidence that it was paid in discharge of such debt. The contract then, for the first time, originated with the government ; and it would have been the same thing if money had then been paid. The case of the Commonwealth v. Newton,(b) decided a few days ago, is analogous to this. There the bonds were due by the state long anterior to the revolution; but Newton having taken out warrants for the interest, in 1778, in the form of loan-office certificates ; those warrants fyere subjected to the scale.
The decree is also erroneous in directing warrants to issue by the auditor, and not certificates by the treasurer.
Call, for the appellee. As to the principal point in the cause, I have not formed any very deliberate opinion. The petition of appeal from the decision of the auditor stated that my client was entitled to the full sum paid into the treasury on account of the British debt, and it is my duty to contend for it.
The Commonwealth entered into an agreement with her citizens, that for whatever amount they would make payments to her on account of their British creditors, she would discharge them. How could they be discharged, if they were afterwards liable to pay ? On every principle of ^contracts, it was the duty of the Commonwealth to exonerate . them ; because she received a valuable consideration. It was no argument to say that the state might have enforced the payment into the Loan-Office of those debts. She did not think proper to do so. If then she chose to become a contractor, instead of exercising her sovereignty, she was bound to perform her contracts.
It may be said that the citizens were not compelled to pay the amount of their British debts into the treasury ? they were only invited to pay them : but, when it is considered that the object of the government was to prevent succours of any kind from going to the enemy, this invitation imposed a moral obligation on the citizens to comply with it. It was also the policy of the state to adopt this mode, because those indebted to the British might not otherwise have been known. This class of citizens ought not alone to fall sacrifices to the calamities of war. In many instances they have been ruined by making those payments, because that circumstance furnished evidence of the debts, which could not otherwise have been proved. Considering the engagement of the *77 state as a contract of indemnity, she was bound to perform it in its full extent. In no instance has the scale been applied to such contracts. Mills v. Bell, in this Court, (a) established this principle. I do not mean to contend that because it was a public debt, it was not to be scaled ; but I rely on the case of the Commonwealth v. Beaumarchais, cited by the Attorney-General, to jjrove that claims against the Commonwealth were to be decided on the same principles, as those between individuals; and, this being a covenant to indemnify, the scale could not be applied to it. There is also an additional reason. All other creditors of the state, who held loan-office certificates, were permitted to exchange them for money. But these who became creditors by depositing their money in payment of British debts, ■were expressly prohibited from dra wing it out again.(Ch. Rev. p. 82.) Thus they were deprived of the use of the money, and prevented from applying it to the payment of other debts.
But ii is said that those who made such deposits can only claim as they are author-ised by particular laws. These laws are ex post facto ; and, although there is no positive provision in our constituí ion declaring that they are not valid, yet this Court has uniformly decided against them. Besides, it is not in the power of the public, by its own ipse dixit, to alter its contracts with individuals.(b) The general law for scaling debts, applied to all persons ; but the act of 1796, is partial and violent in its operation, and made by one of the contracting parlies only. Thus Philip II. King of Spain is said to have abolished all his debts, by his own act. *But, if I am mistaken on the main point, the Attorney-General was equally mistaken on the other. The Chancellor fixed the scale, at the date of the payment into the treasury; which was surely right. In Pleasants v. Bibb(c) the Court decided that, where it appeared from the documents that the contract was of anterior date to the bond, the scale should be applied at the time of the contract. The Governor’s receipt, in this case, refers to the Boan-Office certificate ; and is like the case of Pleasants v. Bibb, where the bond was to carry interest from a prior date. The G ov-ernor had no power to receive the money : he could only give a receipt founded on those of the treasurer in 1777 and 1778, which alone was evidence of the payment.
It is said that this point was settled in the case of the Commonwealth v. Newton ; and that the appellees are not entitled to a warrant, except under the act of 1796. I am of a different opinion, and consider that case as conclusive authority in our favour. Newton merely received his warrant for interest, without reserving a right to contend for further compensation, as in this case. There, too, although the act of Assembly said he should receive his principal debt out of a particular fund, yet, that fund proving unproductive, the Court said his interest should neither be extinguished, nor the debt considered as paid. So here, if Walker cannot obtain justice by receiving payment under the particular provisions of the act of 1796, the Court will look into the original transaction in order to effect it.
Randolph, in reply. With respect to the grand principle ' involved in this case, Walker’s executor is not the only person interested. Hundreds of others are now waiting the event of this decision, and should it be in favour of the appellee, the whole revenues of the State for many years to come would not be sufficient to satisfy their claims. I know that this circumstance will have no weight with this Court ; nor was it intended that it should. Public inconvenience, however, ought always to be a great obstacle to granting any claim ; and nothing but the injunctions of particular laws can justify the granting this, which will be attended with such extraordinary consequences. '"'Not a law can be produced which gives the auditor power to act upon this case. In 1777 and 1778, the money was paid into the treasury ; and it could not be drawn out again until it was authorised by the act of 1796. By this law, the scale was directed to be applied in a particular manner ; and the officers of the government could only act under its positive laws.
But on the merits, the Commonwealth was, not bound to pay the full amount. Virginia, a sovereign state, and not even bound by the confederation, might well say to her citizens, “if you will pay to me the money due from you to my enemies, I will protect you as long as my sovereignty continues. ’ ’ After this, a confederation of the States was formed, which being found inadequate, the people, (of whom the appellee’s testator was one,) in their sovereign character, organized a new government, by which treaties were declared to be the supreme law of the land, and a judiciary was established, whose decisions, by virtue of a treaty subsequently made, annulled those payments. Can anything be more unreasonable than the present claim ? The sovereignty of the State would have been faithful to its contracts ; but was prevented by an act to which the claimants were parties, which act took away that sovereignty.
If this case is considered on the ground of indemnity, Virginia is only answerable for damages. Where an individual undertakes to do a particular thing, and is prevented by a positive law, nothing more could surely be expected, than a retribution, according to, the rate of the injury. What is the quantum, of damage sustained by the appellee’s testator ? He paid money into the treasury in 1777 and 1778, far less valuable than specie. We are willing to pay the worth of this money, but not an imaginary value. The case of Mills v. Bell, related to land, and is not within the reason of this case.
Grotius and Puffendorf have been quoted, as if this question was now- before the Legislature. This is not the first time that the President of this Court has been addressed as if he was sitting in the speaker’s chair, surrounded by the members of the General Assembly.
Call. Mr. Randolph has mistaken the second point. The money was entirely paid in 1777 and 1778, for the British debt, and the certificate carried to the Governor and *78 Council in 1779. With respect to the disability of the State. It is still lawful for the Commonwealth to indemnify. Not so in the case of individuals.
^'Randolph. The Commonwealth said to her citizens, “by virtue of my law, your payments shall operate as a discharge of your British debts.” A superior law has said. Virginia shall not perform her contract in the manner in which she undertook.
Curia advisare vult.
Thursday, November 13. The Judges(a) delivered their opinions.
JUDGE! ROANE!.
This is an appeal from a decree of the Chancery Court for the Richmond District, rendered in favour of the appellee, upon an appeal from a decision by the auditor. The testator of the appellee had paid into the treasury certain sums of money in November, 1777, and April, 1778, on account of a British debt due by him, and delivered the certificates therefor to the Governor, who, on the 25th of May, 1779, granted his receipt for the same. Subsequent to the act of 1796, upon the subject of such payments, the appellee applied for the said sums, with interest, but the officers of the Commonwealth insisted on reducing them by the scale as on the 25th of May, 1779, and not as on the days when the aforesaid sums were paid into the ‘ treasury. The Chancellor decreed for the appellee the sums produced by the application of the scale, as on the days last mentioned. The appellee now insists that the Chancellor ought, moreover, to have decreed him interest from the days aforesaid. He also insists that those sums ought hot to be scaled at all, but be repaid to him at the nominal amount, alleging that he has been obliged to pay up in specie the whole of the British debt aforesaid, under a decision of the Supreme Court of the United States, on that subject.
This last question is extremely important, and, although not much pressed in the argument, must now receive the decision of the Court. The act of 1777, c. 9, under which those payments were made, strongly purports that such payments should operate a discharge of the British debts. At that time Virginia was completely sovereign, and, although she did not confiscate the British debts, she placed herself in the shoes of the creditor, and plighted the faith of the nation that the debtor should be thereby completely discharged. Nothing but the transfer of the sovereignty of Virginia into other hands, the extremity of state necessity, or the unparalleled circumstances and distresses of the revolutionary times, could justify that breach of the public faith, which gave rise to the present application. The situation of this State and of the *other States in the union was such, however, during the revolution, as scarcely to find a parallel in the history and events of other nations. The necessity for emitting large sums of paper money, caused an enormous depreciation in its value, and the Commonwealth was unable to make good its engagements to the holders of that currency, which stipulated a redemption thereof in Spanish milled dollars. In various other views also, the plighted faith of the nation was violated in relation to all descriptions of our citizens, and eventuated in results which nothing but the most imperious and invincible necessity can excuse or justify. Subsequent events, arising from our treaties with Britain, and regulations in favour of British subjects, have exhibited this remarkable spectacle, that such subjects have been completely sheltered from those calamities which, resulting from' the abolition of paper money, overwhelmed and ruined many of our own citizens ! Our political history has exhibited the rare phenomenon of a nation yielding greater attention to the interests of foreigners than of its own people, not only in relation to the British debts now in question, but in the institution of certain Courts, principally with a view to the dispensation of justice, in cases wherein such foreigners are parties.
During the paper money aera, payments actually made to creditors, operated a complete discharge of the nominal value ; and the debtors to British subjects were only deprived of that advantage by the absence of the creditors. That circumstance, however, would have been remedied by the act of 1777, had not the policy of the nation been after-wards retraced, by stipulating a repayment of the British debts in specie. It must be confessed, however, that the value of the paper money paid into the treasury was far below what its nominal amount purported. It must also be admitted, that those debtors have ever gained by such payments, in cases where they were not themselves indebted to others, or were prevented by any causes from making payments to such otherpersons in depreciated paper. In these cases, the money would have continued to depreciate in their hands, and have caused to them a total loss. Considerations of this kind tended to alleviate the regret the commonwealth must feel at the unavoidable rejection of the enormous claims of persons similarly circumstanced with the present appellee.
The act of 1777 does not confiscate the British debts : it only sequesters them, and places the Commonwealth in the situation of a receiver of the money due to ^British subjects. The act indeed declares that the payments into the treasury shall discharge the debtors for so much as should be paid in : but, considering that the act does not confiscate the debts, and that, consequently, none perhaps but the creditors could give regular discharges for them ; the act ought, I think, to be considered as a covenant of indemnity to the debtors. It ought to be considered as a stipulation on the part of the then sovereign Commonwealth of Virginia, that neither by any law, nor any treaty formed with another power, should this payment be affected, nor the debt be considered (in relation to the debtor) otherwise than as completely discharged. But the sovereignty of Virginia, as then existing, has passed into other hands: first, into those of the government of the confederation, and, lastly, into the hands of the present government of the United States. All the citizens of this Commonwealth were parties, and assenting to that change ; and the covenant above spoken of, (if it now exists at all,) is obligatory on the general government only, whose laws and treaties, *79 and the decisions of whose Courts, have violated the faith of the Commonwealth of "Virginia, plighted by the act of 1777, to the injury of the present appellee. Nothing is more clear, than that a sovereignty succeeding to another, also succeeds to all its just engagements, and that a nation shall not be held to a strict performance of its contracts, after its power and character as such have passed away. The liability of nations to revolutions and changes of this kind, is always contemplated in contracts or agreements with individuals or others; and the case before us is the stronger against the appellee in the present instance, in that the change now in question was assented to by him in common with the other citizens of America. If, therefore, any redress exists for the appellee, touching the premises, it is to the government of the United States that he must apply, and not to the Commonwealth of Virginia.
With respect to the question concerning the application of the scale in the case before us, I am of opinion that the Chancellor’s construction upon the subject is correct. The act of 1777 considers the payment of the money into the Loan-Office, as the payment on account of British debts, and the receipt of the Governor has relation to such payment, and is an acquittance for so much as is paid by the debtor. I have examined a receipt by the Governor in a case of this kind, which, though posterior in date to the certificate of the treasurer, recognizes the payment into *the treasury as of a preceding day, on account of a British debt. The agency of the Governor is limited to the receiving and preserving the evidences of payment, and to granting receipts thereupon, pursuant lo the act of 1777. Nothing in the act of the 3d of January, 1788, or in that of the 19th of December, 1796, referring thereto, gives any new rule on the subject, or varies that construction which existed independently thereof. As the paper money was in a state of progressive and rapid depreciation, it is evident that the Commonwealth has received more value in the case in question, than she would repay by applying the scale as on the 25th of May, 1779 ; I am clearly of opinion, that the same value (with interest) should be repaid, as was received by the Commonwealth, which can only be by applying the scale at the respective dates, when the monies in question were paid in. The sums produced by such application, with interest, (deducting the payment already made by the Commonwealth,) is what the appellee is entitled to receive, and, with this variation as to interest, I approve of the Chancellor’s decree.

 2 Call, 122.

 Ante, p. 90.

 3 Call, 320.

1)) G-rotius, 330, Pufiendorf, 865.

 1 Wash. 3.

 Judge Tucker did not sit in this cause.